CLIFTON *v.* GUEST.

4-9006 226 S. W. 2d 61

Opinion delivered January 9, 1950.
Rehearing denied February 13, 1950.

*Brockman & Brockman,* for appellants.

*Coleman, Gantt & Ramsey,* for appellees.

GRIFFIN SMITH, Chief Justice. The question is whether J. H. Culpepper, as executor under his uncle's

will, exercised on behalf of all beneficiaries that fine sense of impartiality and unselfishness the law enjoins upon fiduciaries:[1]

Our view is that when Culpepper's wife, Addie, concluded to purchase the several shares representing interests in the testator's realty and paid from a joint husband-and-wife bank account, the executor's position became too complicated to admit of disinterested services; hence, without being conscious of fraudulent conduct, Culpepper condoned sales at prices substantially below reasonable values.

. . . . . . .

By will M. L. Culpepper directed that his widow receive the statutory allowance and that certain relatives share the residue. Following the testator's death November 8, 1944, one of the named beneficiaries died, survived by four heirs. Early in 1945 the executor wrote all interested persons. Nature of the property, he said, precluded division in kind, making a sale imperative. He thought the realty could be sold for $12,000. The inventory listed it at $13,610, and personalty at $535.25.

None of the devisees offered to purchase on a personal basis, or to buy for the benefit of others. About a year after the executor's letters were written, his wife proposed to pay $300 per share. Nine accepted and executed quitclaim deeds February 4, 1946. Mrs. Guenther, residing in California, demanded $450 for the deed she executed March 16, 1946. These conveyances vested in Mrs. Culpepper 41/56ths of the dower-free realty, leaving 15/56ths in others. Mrs. Hilton and E. D. Hall talked personally with J. H. and Addie Culpepper, and with the executor's attorney. Hall testified that he and Mrs. Hilton were told by Culpepper that a quitclaim deed should be signed "so that we can go ahead and take the property over". Mrs. Culpepper, in handing her check to Hall, said it was all she could afford to pay, "but whenever it's straightened out I will see that you all get more". Mrs. Hilton testified that when she signed the deed Culpepper remarked that "they" would

---

[1] See *Acker* v. *Watkins*, 199 Ark. 573, 134 S. W. 2d 526.

pay $300 "at that time". Mrs. Hilton said the share was worth more, and Culpepper commented, "Sure, all we want is to get possession where we can sell it".

On January 30th, 1945, the executor wrote: "Any heir that is interested in making me a price for which he or she will give a quitclaim deed . . . and receive settlement before the year is out" [may do so]. There was the assurance that such an offer would be considered. On March 12, 1946, Culpepper wrote that the estate was worth $6,412.26 after the widow's allotment had been deducted. He laid emphasis upon the fact that "ten of the fourteen parts have been sold". At this time the executor told the four to whom he was writing that the property had been valued at more than the first estimates, making it possible to offer $450 for outstanding shares, and to allocate $150 more to each of those who had sold for $300.

May 26, 1946, Culpepper wrote R. D. Watkins: "I suppose you know that ten of the fourteen parts have been sold *to one disinterested party and that is out of my hands*".

August 1, 1946, Addie Culpepper wrote that in order to make anything out of the property it had to be sold separately, "so I offered $300 [to] each for a deed and told them I would pay more for each one after I sold the property, or part of it. . . . So you see it was not my intention in the first place to pay only $300 for each share. I only asked for a chance to sell and get some money to pay with". She closed by saying that the property could have been sold six months ago for more than it would currently bring.

The action brought by Mrs. Helen Hall Clifton and others was a prayer that the deeds be cancelled, with restoration of interests. The Court quieted title in Mrs. Culpepper to an undivided 41/56ths interest. Mrs. Clifton, Mrs. Jerald, and Jimmie Hall were each decreed 5/56ths. A sale was directed, proceeds to be divided according to the interests so found.

The evidence suggests a reasonable likelihood that when the executor-husband and his wife first began nego-

tiating, there was no purpose to do more than place title in one person, the idea being to sell to the best advantage of all. It was originally thought by Culpepper that the widow's dower was a third, leaving approximately $8,000 for distribution. When it was found that the widow took half, the remaining $6,000 as estimated would not supply an appreciable sum when divided with fifteen. However, under Culpepper's management, rents on the four apartment buildings were increased from $55 to $110 per month. Appellants refer to gross rents of $6,080.[2] Culpepper admitted that he wrote all of the letters in longhand, and his wife typed them. Mrs. Culpepper testified: "I personally had nothing to do with writing the letters [and] Mr. Culpepper had nothing to do with buying the interests. That was a matter of mine".

In his inventory Culpepper listed the apartment house at $5,500, and two other houses at $1,550. In testifying, he said the apartment building was worth $11,000, but might not bring more than $9,000. He thought the other two were worth $4,000. Nine hundred dollars in cash credited to the testator was not mentioned in the inventory. Two notes—one for $1,035, the other for $1,070—had been paid, although no claim had been filed against the estate. Culpepper then added, "When I say 'we' I refer to Addie and myself. She did most of the collecting of the rents".

Although the executor, on cross-examination, admitted a purpose to equalize all beneficiary payments, his wife stoutly maintained that the original proposals were predicated upon prompt acceptance. Having failed to secure the interests within what she considered a reasonable time, the purpose to acquire became adverse.

The Chancellor was perhaps correct in thinking the purchases did not have their inception in a plan to defraud. But the facts show that all parties were closely related by blood or marriage. It is true that applicable statutes do not expressly prevent the wife of an executor

---

[2] The decree was rendered Dec. 20, 1948. The method by which the total of $6,080 is arrived at is not shown.

from buying lands owned by devisees of the trust, and conditions could arise justifying a Court's approval of such transactions. But the difficulty here is more fundamental. Throughout the trial the executor persisted in declaring a purpose to treat all beneficiaries alike. He had seemingly done an excellent job in putting the property on an improved revenue basis, and quite naturally felt—though he did not express it—that something was due for these services. When his wife stepped into the act with a joint bank account, Culpepper's loyalty to his trust was subjected to an unequal test. If he helped Addie by failing to inform the beneficiaries regarding better values, he indirectly served himself; but if he counseled with the testator's relatives to hold for a while and see what the market for realty would do, he chanced, upon the one hand, being wrong about the rise, while upon the other hand, if right, the wife's prospective profits might be lost through failure of the devisees to sell. In either event his dilemma was genuine, although the law recognized but one duty; and in construing the law we also must adhere to the philosophical observation so aptly made by St. Matthew when he discussed a servant's duty to his master.[3]

There is a conclusive presumption that when a testator names an executor, the person so designated, in accepting the trust, becomes the dead man's living agent, bound in all respects to act for those provided for in the will. There is no divided ground upon which he may stand partly with the beneficiaries (and the creditors, if such there be) and partly with those who would derive subversive advantage from the trust. Our Reports have many cases sustaining the strict rule of accountability. To allow Mrs. Culpepper to retain the advantages she contends for, some shares no doubt paid for with proceeds of estate rentals, would weaken the policy Courts strive to maintain in cases like this, and a precedent sapping at public policy would be the result.

[3] Matthew 6:24.

· Reversed, with directions to set aside the conveyances, for the benefit of all who have complained.[4]

## OPINION SUPPLEMENTED.

### February 13, 1950

GRIFFIN SMITH, Chief Justice. In the petition for rehearing it is urged that the opinion does not expressly direct those who sold their interests to refund to Mrs. Culpepper the amounts they severally received, with interest. While our thought is that the necessity for repayment is implicit in the decision, we do not object to the suggested amendment when limited to the principal. Interest, however, would not be payable, since appellants' rights relate back to the time the deeds were executed.

[4] Appellees moved for dismissal because, as it was alleged, the transcript did not affirmatively show that an appeal was prayed, hence none could have been granted. The Clerk's records show that on June 13th partial transcript was filed. *Certiorari* issued for completion, with return July 2d. When the abbreviated transcript was filed June 13th, summons was issued. June 15th counsel for appellees waived service. In making the indorsement "appeal granted" the Clerk undertook to treat as appellants all who were adversely affected by the decree, giving to the appeals the same force they would have had if the appeals had been granted by the Chancery Court.

[It was stipulated that the property should be sold. It was also agreed that certain corrections in property descriptions be made].